Slip Op. 17-73

### UNITED STATES COURT OF INTERNATIONAL TRADE

**ITOCHU BUILDING PRODUCTS CO., INC.,
TIANJIN JINCHI METAL PRODUCTS CO.,
LTD., TIANJIN JINGHAI COUNTY
HONGLI INDUSTRY & BUSINESS CO.,
CERTIFIED PRODUCTS
INTERNATIONAL INC., CHIIEH YUNGS
METAL IND. CORP., HUANGHUA JINHAI
HARDWARE PRODUCTS CO., LTD.,
SHANGDONG DINGLONG IMPORT &
EXPORT CO., LTD., TIANJIN ZHONGLIAN
METALS WARE CO., LTD., HENGSHUI
MINGYAO HARDWARE & MESH
PRODUCTS CO., LTD., HUANGHUA
XIONGHUA HARDWARE PRODUCTS CO.,
LTD., SHANGHAI JADE SHUTTLE
HARDWARE TOOLS CO., LTD.,
SHANGHAI YUEDA NAILS INDUSTRY
CO., LTD., SHANXI TIANLI INDUSTRIES
CO., LTD., CHINA STAPLE ENTERPRISE
(TIANJIN) CO., LTD., QIDONG LIANG
CHYUAN METAL INDUSTRY CO., LTD.,
ROMP (TIANJIN) HARDWARE CO., LTD.,
CYM (NANJING) NINGQUAN NAIL
MANUFACTURE CO., LTD. a/k/a CYM
(NANJING) NAIL MANUFACTURE CO.,
LTD., SHANXI PIONEER HARDWARE
INDUSTRIAL CO., LTD., and MINGGUANG
ABUNDANT HARDWARE PRODUCTIONS
CO., LTD.,**

Plaintiffs,

**THE STANLEY WORKS (LANGFANG)
FASTENING SYSTEMS CO., LTD., and
STANLEY BLACK & DECKER, INC.,**

Consolidated Plaintiffs,

v.

**Before: Jane A. Restani, Judge**

**Consol. Court No. 12-00065**

Public Version

```
┌─────────────────────────────────────────────────────┐
│  UNITED STATES,                                       │
│                                                       │
│                      Defendant,                       │
│                                                       │
│  MID CONTINENT NAIL CORPORATION,                      │
│                                                       │
│                      Defendant-Intervenor.            │
│                                                       │
└─────────────────────────────────────────────────────┘
```

## OPINION

[Commerce's final results in antidumping duty review are remanded.  Defendant's motion for partial remand is granted.]

Dated: June 22, 2017

Ned H. Marshak, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, argued for plaintiffs.  With him on the brief were Bruce M. Mitchell, Mark E. Prado, and Dharmendra N. Choudhary.

Lawrence J. Bogard, Neville Peterson, LLP, of Washington, DC, argued for consolidated plaintiffs.

Tara K. Hogan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, and Sosun Bae, Trial Attorney.  Of counsel on the brief was Jessica DiPietro, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Adam H. Gordon, The Bristol Group PLLC, of Washington, DC, argued for defendant-intervenor.  With him on the brief was Ping Gong.

Restani, Judge:  The instant litigation challenges the U.S. Department of Commerce

("Commerce")'s final results of the second administrative review of the antidumping ("AD")

duty order on certain steel nails from the People's Republic of China ("PRC").  Certain Steel

Nails from the People's Republic of China:  Final Results and Final Partial Rescission of the

Second Antidumping Duty Administrative Review, 77 Fed. Reg. 12,556, 12,556 (Dep't

Commerce Mar. 1, 2012) ("Final Results"); see also Certain Steel Nails from the People's

Republic of China:  Amended Final Results of the Second Antidumping Duty Administrative

Review, 77 Fed. Reg. 24,462, 24,462 (Dep't Commerce Apr. 24, 2012).  Before the court are

three motions for judgment on the agency record pursuant to U.S. Court of International Trade

Rule 56.2, one by plaintiffs Tianjin Jinchi Metal Products Co., Ltd. ("Jinchi"), Tianjin Jinghai

County Hongli Industry & Business Co. ("Hongli"), Certified Products International Inc., Chiieh

Yungs Metal Ind. Corp., Huanghua Jinhai Hardware Products Co., Ltd., Shangdong Dinglong

Import & Export Co., Ltd., Tianjin Zhonglian Metals Ware Co., Ltd., Hengshui Mingyao

Hardware & Mesh Products Co., Ltd., Huanghua Xionghua Hardware Products Co., Ltd.,

Shanghai Jade Shuttle Hardware Tools Co., Ltd., Shanghai Yueda Nails Industry Co., Ltd.,

Shanxi Tianli Industries Co., Ltd., China Staple Enterprise (Tianjin) Co., Ltd., Qidong Liang

Chyuan Metal Industry Co., Ltd., Romp (Tianjin) Hardware Co., Ltd., CYM (Nanjing) Ningquan

Nail Manufacture Co., Ltd. a/k/a CYM (Nanjing) Nail Manufacture Co., Ltd., Shanxi Pioneer

Hardware Industrial Co., Ltd., Mingguang Abundant Hardware Productions Co., Ltd., and Itochu

Building Products Co., Inc. (collectively, "Itochu"); another by consolidated plaintiffs The

Stanley Works (Langfang) Fastening Systems Co., Ltd. ("Stanley Langfang") and Stanley Black

& Decker, Inc. (collectively, "Stanley"); and the last by defendant-intervenor Mid Continent Nail

Corporation ("Mid Continent").  See Mem. in Supp. of the Rule 56.2 Mot. for Pls. The Stanley

Works (Langfang) Fastening Systems Co., Ltd. and Stanley Black & Decker Inc. for J. upon the

Admin. R., ECF No. 39-4 ("Stanley Br."); Pls.' Rule 56.2 Mot. for J. upon the Agency R., ECF

No. 40 ("Itochu Br."); Mid Continent's Rule 56.2 Mot. for J. on the Agency R., ECF No. 41

("Mid Continent Br.").  Also, before the court, is the government's motion for partial remand.

Def.'s Mot. for Voluntary Partial Remand & Consent Mot. for Errata, ECF No. 120 ("Gov't Mot.

for Partial Remand").  For the reasons stated below, Commerce's Final Results are remanded,

and the government's motion for partial remand is granted.

# BACKGROUND

On September 29, 2010, Commerce published a notice of initiation for 222 companies of the second administrative review of the AD order on certain steel nails from the PRC, covering the period of review ("POR") of August 1, 2009, through July 31, 2010.  Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part, 75 Fed. Reg. 60,076, 60,078–81 (Dep't Commerce Sept. 29, 2010) ("Initiation Notice"). On December 16, 2010, Commerce selected the three largest exporters by volume as mandatory respondents:  Stanley, Hongli, and Qingdao Jisco Co., Ltd. ("Jisco").  First Respondent Selection Mem. at 6–7, CD 51 pt. 1[1] (Dec. 16, 2010); see Certain Steel Nails from the People's Republic of China:  Preliminary Results and Preliminary Rescission, in Part, of the Antidumping Duty Administrative Review and Preliminary Intent to Rescind New Shipper Review, 76 Fed. Reg. 56,147, 56,148 (Dep't Commerce Sept. 12, 2011) ("Preliminary Results").  After Commerce received requests from both Jisco and Mid Continent to withdraw their respective requests for review of Jisco, Commerce replaced Jisco and selected Jinchi as the third mandatory respondent. Second Respondent Selection Mem. at 2, PD 147 pt. 1 (Jan. 21, 2011); see Preliminary Results, 76 Fed. Reg. at 56,148.

Commerce considers the PRC to be a non-market economy ("NME").  In calculating a dumping margin for subject merchandise from an NME country, Commerce compares the goods' normal value,[2] derived from factors of production ("FOPs") as valued in a surrogate

---

[1] Because the public and the confidential version of the record are split into two parts each, public record citations are in the format "PD __ pt. __" and confidential record citations are in the format "CD __ pt. __" with "pt." referring to part 1 or part 2.

[2] Normal value is the price

(continued . . .)

market economy ("ME") country, to the goods' export price.[3]  Commerce must use the "best

available information" in selecting surrogate data.  19 U.S.C. § 1677b(c)(1)(B) (2006).  The

surrogate data must "to the extent possible" be from one or more ME countries that are "at a

level of economic development comparable to that of the nonmarket economy country, and" are

"significant producers of comparable merchandise."  Id. § 1677b(c)(4).

On September 12, 2011, Commerce issued its Preliminary Results.  76 Fed. Reg. at

56,147.  To calculate the surrogate financial ratios,[4] Commerce relied on the financial

statements of three Indian companies:  Bansidhar Granites ("Bansidhar"), Nasco Steel Pvt. Ltd.

("Nasco"), and J&K Wire and Steel ("J&K").  Id. at 56,154.  Moreover, Commerce applied

neutral facts otherwise available[5] to fill gaps created by unreported FOP data from both

---

at a time reasonably corresponding to the time of the sale used to determine the
export price or constructed export price . . . at which the foreign like product is
first sold . . . for consumption in the exporting country, in the usual commercial
quantities and in the ordinary course of trade and, to the extent practicable, at the
same level of trade as the export price or constructed export price[.]

19 U.S.C. § 1677b(a)(1)(A), (B)(i).

[3] Export price is the price of subject merchandise when it "is first sold . . . before the date of
importation by the producer or exporter of the subject merchandise outside of the United States
to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to
the United States."  19 U.S.C. § 1677a(a).

[4] Commerce calculated financial ratios to value factory overhead; selling, general, and
administrative expenses; and profit.  Preliminary Results, 76 Fed. Reg. at 56,154.

[5] By statute, Commerce may apply "facts otherwise available" pursuant to 19 U.S.C. § 1677e(a).
If, when applying facts otherwise available to fill gaps in the record, Commerce determines

that an interested party has failed to cooperate by not acting to the best of its
ability to comply with a request for information from [Commerce, then
Commerce, in calculating a dumping margin,] may use an inference that is
adverse to the interests of that party in selecting from among the facts otherwise
available[.]

(continued . . .)

unaffiliated tollers[6] and unaffiliated suppliers used by the mandatory respondents.  Id. at 56,148–

49.  Commerce noted that Stanley and Jinchi "used unaffiliated tollers for production of tolled

intermediate inputs" and found that neither failed to cooperate, even though each respondent was

unsuccessful at obtaining FOP data from their tollers, because each respondent documented their

attempts to obtain the missing information.  Id. at 56,148.  Commerce also explained that all

three mandatory respondents, failed to provide FOP data from unaffiliated suppliers of subject

merchandise.  Id. at 56,149.  Although Hongli did provide the FOP data for its supplier before

the Preliminary Results, Commerce rejected it as unsolicited and untimely because it was

submitted after the deadline.  Id.  Nevertheless, Commerce found that no respondent failed to

cooperate by not acting to the best of its ability because each "attempted to obtain the FOPs from

the unaffiliated producers and documented these attempts."  Id.  Commerce stated, however, that

after the Preliminary Results, it would issue questionnaires directly to each of the mandatory

respondents' unaffiliated suppliers for whom FOP data was unreported.  Id.

On March 1, 2012, Commerce published the Final Results.  77 Fed. Reg. at 12,556.  In

the Final Results, Commerce determined it would no longer rely on Nasco's and J&K's financial

statements because those data were not contemporaneous with the POR.  Certain Steel Nails

from the People's Republic of China:  Issues and Decision Memorandum for the Final Results of

the Second Antidumping Duty Administrative Review at 12, PD 117 pt. 2 (Feb. 23, 2012) ("I&D

---

19 U.S.C. § 1677e(b).  The term "neutral facts available" refers to a situation where the
conditions in § 1677e(a) are met, but Commerce does not apply an adverse inference pursuant to
§ 1677e(b).  The term "adverse facts available" ("AFA") relates to when Commerce does apply
an adverse inference pursuant to § 1677e(b).

[6] Per prior notices and regulations, Commerce's use of the term "tollers" apparently refers to
subprocessors or subcontractors.  See, e.g., 19 C.F.R. § 351.401(h) (2002); Antidumping Duties;
Countervailing Duties, 61 Fed. Reg. 7308, 7330 (Dep't Commerce Feb. 27, 1996).

Memo"). Instead, Commerce averaged the financial statements of Bansidhar and Sundram

Fasteners Limited ("Sundram"). Id. at 11. As a result of this change, the surrogate financial

ratio for factory overhead increased from 2.98% to 22.19%, the ratio for selling, general, and

administrative expenses increased from 9.10% to 11.79%, and the ratio for profit increased from

1.13% to 4.99%. Compare Surrogate Values for the Preliminary Results at 16, PD 7–11 pt. 2

(Aug. 31, 2011), with Surrogate Values for the Final Results at 3, PD 106 pt. 2 (Feb. 23, 2012)

("SVs for Final Results").

     With respect to the facts available determinations, Commerce continued to apply partial

neutral facts available to Stanley and Jinchi for the unreported FOP data from their unaffiliated

tollers. I&D Memo at 18–19, 26–27. Commerce did not apply facts available to Hongli because

its unaffiliated supplier of cut plate masonry nails[7] responded to Commerce's post-Preliminary

Results request and provided the missing information. Id. at 23. To value the unaffiliated

supplier's nails, the main input of which is cut steel plate, Commerce selected a surrogate value

for cut steel plate derived from Global Trade Atlas ("GTA") India import data, rather than

relying on other sources on the record. Id. at 24–25.

     Commerce, however, did apply partial adverse facts available ("AFA")[8] to Jinchi for the

missing FOP data from its unaffiliated supplier. Id. at 27–28. Commerce justified this differing

treatment of missing toller data and missing supplier data, explaining that "tollers simply

---

[7] The supplier at issue is [[                                                        ]]. FOPs for
Certain Nails Exported by Hongli and Produced by Unaffiliated Supplier at 1, CD 15–17 pt. 2
(Sept. 28, 2011) ("Hongli Supplier's FOPs").

[8] The phrases "partial AFA" and "total AFA" are not referenced in either the statute or the
agency's regulations. Total AFA can be understood, within the context of this case, as referring
to Commerce's application of the "facts otherwise available" and "adverse inferences"
provisions of 19 U.S.C. § 1677e to arrive at a total replacement margin. Partial AFA, on the
other hand, is when Commerce applies an adverse inference to only a portion of a party's data.

*Confidential Information Omitted*

perform a function at one stage in the production process, whereas unaffiliated suppliers provide

finished merchandise that is independently subject to the order." Id. at 19; see id. at 27.

Commerce, thus, decided it would apply an adverse inference to a respondent for its unaffiliated

supplier's failure to cooperate. Id. at 19, 27.

     After making these changes, Commerce calculated weighted-average AD margins of

3.80%, 47.76%, and 78.27%, for Stanley, Hongli, and Jinchi, respectively. Final Results, 77

Fed. Reg. at 12,558. These represented increases in each respondent's margins from the

Preliminary Results, in which Commerce calculated weighted-average AD margins of 1.24%,

19.59%, and 31.27%, for Stanley, Hongli, and Jinchi, respectively. 76 Fed. Reg. at 56,154.

Similarly, the AD margin for the separate rate respondents, which was calculated by weight-

averaging the margins of the mandatory respondents, increased from 7.60% in the Preliminary

Results to 19.30% in the Final Results. Preliminary Results, 76 Fed. Reg. at 56,151, 56,154–55;

Final Results, 77 Fed. Reg. at 12,557–58. The PRC-wide rate of 118.04% remained unchanged.

Preliminary Results, 76 Fed. Reg. at 56,154; Final Results, 77 Fed. Reg. at 12,558.

     Foreign respondents, collectively, raise several challenges. First, Itochu argues

Commerce erred in selecting surrogate GTA India import data to value cut steel plate. Itochu Br.

at 19–27. Second, Stanley and Itochu oppose Commerce's reliance on Sundram's financial

statements to calculate the surrogate financial ratios. Stanley Br. at 26–40; Itochu Br. at 27–39.

Third, Itochu contends that Commerce erred by applying partial AFA to Jinchi's unreported,

finished nails produced by its unaffiliated supplier. Itochu Br. at 8–19. Fourth, Itochu

challenges the rate assigned to separate rate respondents as unlawfully relying on Jinchi's partial

AFA rate. Id. at 39–40.[9]

Mid Continent, the domestic petitioner, also takes issue with Commerce's Final Results.

First, Mid Continent argues that Commerce erred in selecting only three mandatory respondents

to review. Mid Continent Br. at 14–19. Second, it contends that Commerce should have applied

partial AFA to Stanley and Jinchi for failure to provide FOP data on behalf of their unaffiliated

tollers. Id. at 19–28. Third, it argues Commerce should have applied partial AFA to Hongli for

not acting to the best of its ability by not providing FOP data from its unaffiliated supplier

sooner. Id. at 19–31.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). Commerce's final results in

an administrative review of an AD duty order are upheld unless they are "unsupported by

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.

§ 1516a(b)(1)(B)(i).

### DISCUSSION

I.     **Respondent Selection**

A.     Reasonable Number

Mid Continent challenges Commerce's decision to limit its individual review to only

three mandatory respondents because, according to it, doing so fails to accurately represent the

Chinese nails industry. Mid Continent Br. at 14–15. Mid Continent avers that three respondents

---

[9] Stanley initially also challenged Commerce's use of zeroing to calculate its weighted-average dumping margin. Stanley Br. at 12–26; Compl. ¶¶ 17–18, Stanley Works (Langfang) Fastening Sys. Co. v. United States, No. 12-00080 (CIT Apr. 26, 2012), ECF No. 16. Stanley has since moved to dismiss that claim. Pls.' Mot. for Voluntary Dismissal of the First Count of their Compl. 1–2, ECF No. 98. The court granted that motion. Order 2, July 23, 2013, ECF No. 99.

is not a "reasonable number" as required by law, arguing instead for Commerce to review, at

least, between four to eight respondents.  Id. at 15–19.  The government and Itochu respond that

Commerce acted within its discretion by selecting the three largest exporters by volume for

whom a review was requested because this selection provided for broad coverage of subject

merchandise.  Itochu Bldg. Prod. Inc.'s Resp. to Mid Continent Nail Corp.'s Rule 56.2 Mot. for

J. upon the Agency R. 5–13, ECF No. 61 ("Itochu Resp."); Def.'s Opp'n to Pls.' Mots. for J.

upon the Agency R. 9–13, ECF No. 62 ("Gov't Br.").[10]

     Normally, Commerce "shall determine the individual weighted average dumping margin

for each known exporter and producer of the subject merchandise."  19 U.S.C. § 1677f-1(c)(1).

The statute, however, provides an exception that "[i]f it is not practicable to make individual

weighted average dumping margin determinations . . . because of the large number of exporters

. . . the administering authority may determine the weighted average dumping margins for a

reasonable number of exporters."  Id. § 1677f-1(c)(2) (allowing Commerce to limit its

---

[10] Itochu also argues that Mid Continent failed to exhaust this claim at the administrative level by
not raising it in its post-Preliminary Results case brief.  Itochu Resp. at 13–15; see 19 C.F.R.
§ 351.309(c)(2) (requiring exhaustion in an administrative case brief).  By statute, the court has
discretion to "where appropriate, require the exhaustion of administrative remedies."  28 U.S.C.
§ 2637(d); see Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1381 (Fed.
Cir. 2013).  Requiring exhaustion is not appropriate here.  The court has explained that "[a] party
may be excused from failure to raise an argument before the administrative agency . . . if it is
clear that the agency had an opportunity to consider it."  Holmes Prods. Corp. v. United States,
16 CIT 1101, 1104 (1992) (internal citations omitted).  This case presents the unique situation
where the government conceded at oral argument that Commerce did consider this issue.  Tr. of
Civil Cause for Oral Arg. at 207, ECF Nos. 107–107-1 ("Tr. of Oral Arg.") ("[I]n our mind
. . . the issue was properly raised in a timely manner, fully briefed by all the parties, and
considered by Commerce.  So . . . we're not challenging or alleging that they failed to exhaust
their remedies.").  The government's concession here weighs strongly in favor of not requiring
exhaustion as there is no prejudice to the agency.  See Itochu Bldg. Prods. v. United States, 733
F.3d 1140, 1145 (Fed. Cir. 2013) ("Requiring exhaustion can protect administrative agency
authority and promote judicial efficiency.").  Thus, the court reaches Mid Continent's argument.

examination either to a "statistically valid" sample of exporters or to exporters importing the

largest volume of subject merchandise).  There is no "magic number" to satisfy the reasonable

number language because "whether a certain number of mandatory respondents is 'reasonable' in

any particular case is likely to depend on the facts of that case, such as the subject merchandise

at issue, the respondents chosen, the mandatory respondents' share of the total volume of

imports, and other factors."  Husteel Co. v. United States, 98 F. Supp. 3d 1315, 1329 (CIT 2015).

Commerce's decision to individually examine three mandatory respondents in this case is

in accordance with law.  First, Commerce properly exercised its authority to limit the number of

respondents selected for individual examination because the 222 companies for which review

was initially requested is clearly a "large" number of respondents pursuant to 19 U.S.C. § 1677f-

1(c)(2).  First Respondent Selection Mem. at 3–4; see Shenzhen Xinboda Indus. Co. v. United

States, 180 F. Supp. 3d 1305, 1319 n.15 (CIT 2016) (stating that a pool of thirty-eight potential

respondents is non-controversially large).  And, although Mid Continent submitted a letter

withdrawing its request for review of 160 companies including mandatory respondent Jisco, a

situation which eventually caused Commerce to select an alternate respondent, the sixty-two

respondents remaining in the pool still constitute a "large" number.  See Certain Steel Nails from

the People's Republic of China:  Notice of Extension of Time Limits and Partial Rescission of

the Second Antidumping Duty Administrative Review, 76 Fed. Reg. 23,788, 23,789 (Dep't

Commerce Apr. 28, 2011) ("Partial Rescission").

Second, Commerce's decision to limit its individual examination to the three largest

exporters by volume is lawful because, based upon this record, three is a reasonable number.

The three mandatory respondents selected accounted for a substantial share of total volume of

exports of subject merchandise.[11]  Although increasing the number of respondents individually

examined by two to five total respondents would obviously increase the total percentage of

exports actually subject to examination, that five may be preferable is not enough to hold that

Commerce's decision is unsupported by substantial evidence.

      Mid Continent also claims that Commerce's selection of the three largest exporters is not

representative of the Chinese nails industry, which includes both large and small producers.  Mid

Continent Br. at 14.  But, Mid Continent does not contest that Commerce lawfully limited its

review to the "exporters and producers accounting for the largest volume of subject merchandise

from the exporting country," see 19 U.S.C. § 1677f-1(c)(2)(B), and it does not make an argument

before the court to explain why selecting the next two largest exporters by volume would

account for this lack of representativeness attributable to reviewing only the largest and most

efficient exporters or producers.  Indeed, it appears unlikely for that to be the case given that the

next two largest exporters' share of total exports is more similar to the already-selected

mandatory respondents, rather than to exporters much further down the list.  See First

Respondent Selection Mem. at Attach. 1.  All things being equal, Commerce's decision to limit

its examination to the three largest exporters by volume, where those exporters comprise a

meaningful share of total volume of exports of subject merchandise, is not contrary to law.  The

---

[11] When Commerce initially selected respondents, the top three respondents that it selected—
Stanley, Hongli, and Jisco—accounted for [[      ]] percent of the total volume of subject
merchandise exported from the PRC to the United States according to the United States Customs
and Border Protection ("Customs") data relied on by Commerce.  See First Respondent Selection
Mem. at Attach. 1.  After Commerce rescinded its review of Jisco, it replaced Jisco with Jinchi.
Second Respondent Selection Mem. at 1–2.  According to the Customs data, Stanley, Hongli,
and Jinchi, together, still make up [[      ]] percent of the total volume of exports of subject
merchandise.  First Respondent Selection Mem. at Attach. 1.

*Confidential Information Omitted*

court, however, requires further attention to the circumstances which led to the particular

selection.

        B.        Withdrawal of Requests for Review

        The court requires Mid Continent to further explain the circumstances of the respondent

selection process.  In this case, Commerce initiated the administrative review for 222 companies

for which it received a request for review.  Initiation Notice, 75 Fed. Reg. at 60,078–81.  Mid

Continent itself initially requested review of 219 companies.  Mid Continent Req. for Admin.

Review at Attach. A, PD 11 pt. 1 (Aug. 31, 2010).  After a review had been initiated and

respondents initially selected, Jisco, a mandatory respondent, withdrew its request to be reviewed

and, five days later, Mid Continent, probably not coincidentally, also withdrew its request for

review of Jisco and 159 other companies.  Partial Rescission, 76 Fed. Reg. at 23,789.  Mid

Continent's withdrawal occurred on the last possible day for requests to be withdrawn so that

Commerce would rescind the requested reviews in accordance with regulation.  Compare 19

C.F.R. § 351.213(d)(1) (stating that Commerce will rescind an administrative review, if the party

that requested such a review withdraws its request within 90 days of a notice of initiation), with

Initiation Notice, 75 Fed. Reg. at 60,076 (initiating the present review on September 29, 2010).

This is not the only case in which a domestic party has requested a broad review, only to

withdraw a large number of its requests for review.  For instance, in cases involving wooden

bedroom furniture from the PRC, the practice of withdrawing broad requests for review in

exchange for so-called "settlement payments" is both well-documented and concerning.  See

James R. Hagerty, Cash Softens a Trade Blow, Wall St. J. (Feb. 15, 2011), available at

https://www.wsj.com/articles/SB10001424052748704081604576144401022132530; see also

Wooden Bedroom Furniture from China, USITC Pub. 4203, Inv. No. 731-TA-1058 at III-2–III-3

(Dec. 2010) (explaining details regarding the payments).  There, "Chinese firms . . . agreed . . .

each time to pay cash to their U.S. competitors in return for being removed from the review list."

Hagerty, Cash Softens a Trade Blow.  The concerns raised by these payments are magnified by

their economic consequence because, under these arrangements, potential dumping duties that

would normally be payable to the government are, instead, dispersed to a private party.  6 U.S.C.

§ 212(a); see also Giorgio Foods, Inc. v. United States, 785 F.3d 595, 598 & n.5 (Fed. Cir. 2015)

(explaining that the Byrd amendment was repealed and, therefore, duties for entries made after

October 1, 2007, no longer may be distributed to domestic petitioners).

        Thus, the facts in this case beg the questions:  why was a broad review initially

requested?  And, how did it come about that Mid Continent withdrew the majority of the

requests for review?  For the sake of transparency, if payments were made in this case, any

information pertaining to such an exchange, as well as the legal basis for the collection of such

payments by a party other than the government, should be provided.  As detailed in this court's

order, Mid Continent shall provide to Commerce responses to these inquiries.

        Mid Continent's responses may bear on the integrity of the proceedings.  If, for instance,

a petitioner is manipulating AD margins by taking advantage of Commerce's regulations

allowing for the withdrawal of a request for review, such a situation is not only legally suspect

but also would hinder Commerce's ability to administer the dumping law properly.  Both

Commerce and the court must seek to preserve the integrity of such proceedings from fraud in

order to safeguard public institutions and to allow for the proper administration of justice.  See

Tokyo Kikai Seisakusho, Ltd. v. United States, 529 F.3d 1352, 1360–61 (Fed. Cir. 2008); cf.

Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246 (1944) ("[T]ampering with the

administration of justice . . . is a wrong against the institutions set up to protect and safeguard the

public, institutions in which fraud cannot complacently be tolerated . . . .").  Therefore, on

remand, Commerce shall review Mid Continent's responses to the questions posed by the court,

and, as necessary, reopen the record to solicit information from the parties pertaining to those

responses.  In deciding whether to reopen the record, Commerce should consider the twin goals

of preventing fraud on the proceedings and promoting transparency.  Finally, Commerce shall

determine whether the parties acted in a legal manner or not and what remedy or further

proceedings are appropriate if the actions were not lawful.

## II.    Surrogate Values

Commerce must use the "best available information" from "one or more" surrogate ME

countries to value FOPs.  19 U.S.C. § 1677b(c)(1)(B), (c)(4).  Although Commerce enjoys broad

discretion in determining the best available information, QVD Food Co. v. United States, 658

F.3d 1318, 1323 (Fed. Cir. 2011), that discretion is limited by the statute's objective of

calculating dumping margins as accurately as possible, Calgon Carbon Corp. v. United States,

145 F. Supp. 3d 1312, 1323 (CIT 2016).  Therefore, in order for its selection to be supported by

substantial evidence, Commerce's choice of the best available information "must evidence a

rational and reasonable relationship to the factor of production it represents."  Id. (quoting Hebei

Metals & Minerals Imp. & Exp. Corp. v. United States, 28 CIT 1185, 1191 (2004)).  Further,

Commerce "must defend its surrogate choices when confronted with data undermining the

surrogate's reliability."  Blue Field (Sichuan) Food Indus. Co. v. United States, 949 F. Supp. 2d

1311, 1326 (CIT 2013).  A reviewing court evaluates "whether a reasonable mind could

conclude that Commerce chose the best available information."  Zhejiang DunAn Hetian Metal

Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (quoting Goldlink Indus. Co. v.

United States, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006)).

    A.    Steel Plate[12]

Itochu opposes Commerce's selection of GTA India import data, i.e., a surrogate value of

$1.68 per kilogram, to value cut steel plate, arguing that Commerce should have relied on a

combination of Steelworld India data and Joint Plant Committee ("JPC") India data, both

domestic sources.  Itochu Br. at 19–23.  Itochu also maintains that Commerce improperly

rejected certain surrogate data from other non-primary surrogate countries that impeach the

reliability of the selected GTA India import data.  Id. at 23–27.

The government responds that Commerce properly relied on GTA India import data

"specifically match[es] the thickness of the steel plate Commerce sought to value," whereas the

JPC and Steelworld data are based on significantly thicker cut steel plate.  Gov't Br. at 25–27;

see also Mid Continent Nail Corp.'s Resp. to Pls.' Rule 56.2 Mots. & Brs. in Supp. 26–29, ECF

No. 67 ("Mid Continent Resp.").  As for the other, non-Indian data points, the government and

Mid Continent explain that Commerce lawfully considered and rejected those sources.  Gov't Br.

at 27–28; Mid Continent Resp. at 29–31.

Commerce's selection of the GTA India import data to value steel plate is unsupported by

substantial evidence.  The sources on the record, in order of decreasing value, included:  GTA

India import data for Harmonized Tariff Schedule ("HTS") 7208.53.10 ($1.68 per kilogram),

GTA United States import data for HTS 7208.53 ($0.78 per kilogram), GTA Germany export

data for HTS 7208.53 ($0.78 per kilogram), JPC India data ($0.78 per kilogram), GTA Germany

export data for HTS 7208.53.90 ($0.77 per kilogram), Europe MEPS data for hot-rolled plate

($0.75 per kilogram), World HR Steel Plate data for hot-rolled steel plate ($0.72 per kilogram),

---

[12] Although the three mandatory respondents consumed steel wire rod in their production of steel
nails, see I&D Memo at 15, Commerce selected a surrogate value for cut steel plate, which is the
main input of the cut plate masonry nails purchased by Hongli from its supplier, id. at 24.

India MEPS data for hot-rolled plate ($0.71 per kilogram), GTA Germany import data for HTS

7208.53.90 ($0.68 per kilogram), Steelworld India data ($0.68 per kilogram), and GTA

Philippines import data for HTS 7208.53.00.00 ($0.49 per kilogram). [13]  See Itochu Second Pre-

Prelim Surrogate Value Rebuttal Submission at Exs. 2A–2N, PD 277 pt. 1 (June 24, 2011)

("Itochu Second Pre-Prelim SV Submission").[14]  In its Final Results, Commerce relied on GTA

India import data because Commerce determined that domestic "JPC and Steelworld data for cut

steel plate . . . are for significantly thicker cut steel plate than what Hongli's supplier used to

make the subject merchandise."[15]  I&D Memo at 25.  Thus, Commerce found JPC and

Steelworld data did not satisfy its specificity criterion.  Id.; see Policy Bulletin 04.1, Non–Market

Economy Surrogate Country Selection Process (Mar. 1, 2004), available at

http://enforcement.trade.gov/policy/bull04-1.html (last visited June 9, 2017) (preferring data that

reflect "prices specific to the input in question").  Commerce also rejected GTA Philippines data,

---

[13] For the six-digit tariff heading, the 2010 HTS heading for 7208.53 covers "Flat-rolled products of iron or nonalloy steel, of a width of 600 mm or more, hot-rolled, not clad, plated or coated: . . . Other, not in coils, not further worked than hot-rolled:  . . . Of a thickness of 3 mm or more but less than 4.75 mm."  See, e.g., U.S. Int'l Trade Comm'n, Harmonized Tariff Schedule of the United States Ch. 72 (2010), available at https://www.usitc.gov/sites/default/files/publications/docs/tata/hts/bychapter/1000c72_0.pdf (last visited June 9, 2017); see also Itochu Second Pre-Prelim Surrogate Value Rebuttal Submission at Exs. 2C–2H, PD 277 pt. 1 (June 24, 2011) ("Itochu's Second Pre-Prelim SV Submission").  By contrast, the relevant JPC value covers steel plate for 6 millimeters, and the JPC data also includes prices for thicknesses of 10, 12, and 25 millimeters.  Itochu's Second Pre-Prelim SV Submission at Ex. 2L.  And, Steelworld value covers steel plate for 5 to 6 millimeters, and the Steelworld data also provides prices for plate of thicknesses of 8, 10, 12, 16, and 20 millimeters.  Id. at Ex. 2N.

[14] Regarding the data sources for which average unit value was not provided by the original source in U.S. dollars per kilogram, the value was calculated by Itochu using historical exchange rate information and is included here for ease of reference.  Each value is rounded to the nearest hundredth.  No party in this action questions the accuracy of Itochu's conversions.

[15] [[          ]], Hongli's supplier, reported purchasing steel plate that is [[                    ]] thick.  Hongli Supplier's FOPs at Ex. 5.

*Confidential Information Omitted*

which was the only other data point from an economically comparable country, due to

Commerce's stated preference to select data from the primary surrogate country.  I&D Memo at

25.  And, Commerce determined that "the other sources on the record, . . . have no probative

value."  Id. (emphasis added).

        First, Commerce improperly failed to consider, by outright rejecting, the other surrogate

data sources on the record as having "no probative value."  Id.  Commerce explained that these

other data instead are: "1) for hot rolled plate of an unknown thickness (Europe MEPS, World

HR Steel Plate, and India MEPS); 2) export values (GTA Germany); and/or 3) from or including

countries outside the approved surrogate country list (US import data, GTA Germany, Europe

MEPS, and World HR Steel Plate)."  Id. (footnote omitted).  Commerce's decision, however, to

completely disregard this record evidence that "fairly detracts" from its conclusion was

unreasonable.  See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); see also Blue

Field, 949 F. Supp. 2d at 1326–27.  As is discussed in more detail below, record evidence calls

into question Commerce's conclusion that on this record steel plate thickness is an appropriate

method for differentiating between surrogate sources.  Commerce also failed to provide any

rationale for why it does not consider export values in evaluating the best available

information.[16]  See I&D Memo at 25.  But, as the court has explained, "export data from

_____

[16] Instead, Commerce "note[d] that it has rejected similar export data for benchmarking
purposes."  See I&D Memo at 25 n.78 (citing Shanghai Eswell Enter. Co. v. United States, 31
CIT 1570 (2007)).  The case cited by Commerce does not support its statement.  In Shanghai
Eswell, Commerce did not base its valuation of raw honey on export price data.  See 31 CIT at
1573.  The court ultimately remanded to Commerce to adequately explain how it took into
account record evidence of a price decline during the POR, a decline that was supported by
respondents' World Trade Atlas export price data showing a decrease in prices over the second
half of the POR.  Id. at 1574–75.  There, Commerce claimed that it did take the price decline into
account, but the court did not deem Commerce's explanation sufficient.  Id.  Similarly here,
                                                                          (continued . . .)

countries that were not potential surrogates" may be "sufficient to call into question the reliability of the [selected surrogate] data." <u>Xinjiamei Furniture (Zhangzhou) Co. v. United States</u>, Slip Op. 13-30, 2013 WL 920276, at *3, *6 (CIT Mar. 11, 2013).  And, Commerce's decision to summarily reject data from non-economically comparable countries as not probative has similarly been rejected by the court.  <u>See</u> <u>Peer Bearing Co.-Changshan v. United States</u>, 804 F. Supp. 2d 1337, 1352 (CIT 2011) ("The mere fact that the data do not come from a country at a level of economic development comparable to that of China does not preclude Commerce from considering those data in choosing between [surrogate] data . . . .").

 Contrary to Commerce's conclusion, these data do appear to be relevant.  Excluding the GTA India import data and the GTA Philippines import data, all of the nine other data points fall within the narrow range of $0.68 to $0.78 per kilogram.  Itochu Second Pre-Prelim SV Submission at Exs. 2D–2G, 2I, 2K–2N.  These data, therefore, corroborate the Steelworld India value of $0.68 per kilogram and the JPC India value of $0.78 per kilogram.  <u>Id.</u> at Exs. 2L, 2N. At the same time, the data call into question the GTA India import value of $1.68 per kilogram, which is more than double the highest value in the aforementioned range.  <u>Id.</u> at Ex. 2C.  Such a difference is likely meaningful when dealing with the main input of a relatively inexpensive product such as nails.  Indeed, the probative value of these figures may be better understood when considering the comparative reliability of the underlying data.  For example, the GTA Germany import value of $0.68 per kilogram and GTA United States import value of $0.78 per kilogram are based on much larger quantities of imports—142,890 and 13,423.68 metric tons, respectively—than the GTA India import data—102.85 metric tons.  <u>Id.</u> at Exs. 2C, 2F–2G.

---

Commerce failed to adequately dispose of the relevance of export data that seemingly undermines Commerce's selected surrogate value.

Even the GTA Philippines import value, which derives from a country that Commerce found to

be economically comparable to the PRC, is based on a higher quantity of imports—271.37

metric tons—than the GTA India import data.  Id. at Ex. 2H.  Notably, the GTA Philippines

import value of $0.49 per kilogram is even lower than any other surrogate value on the record,

falling below the aforementioned range of $0.68 per kilogram to $0.78 per kilogram, and thereby

also undermines Commerce's selected value.  See id.

    Second, Commerce failed to address record evidence that price does not correlate to steel

plate thickness when it rejected the JPC and Steelworld data as not sufficiently specific.[17]  Not

only is Commerce unable to point to record evidence to show that thickness drives price, Itochu

has supplied several data sources to undermine such a belief.  Specifically, the GTA Germany

import data, GTA United States import data, and GTA Germany export data all derive from the

same six-digit tariff heading and have the same thickness, 3 to 4.75 millimeters, as the GTA

India import data.  Id. at Exs. 2C–2G.  But, these sources provide values in the same range as the

JPC and Steelworld data.[18]  Moreover, domestic India data from JPC, which includes various

prices for steel plates of thickness in the range of 6 to 25 millimeters over time, and from

Steelworld, which includes various prices for steel plates in the range of 5 to 20 millimeters over

time, both indicate that as thickness increases, price slightly increases.  Id. at Exs. 2L, 2N.  But,

the GTA India import data is for a thinner steel plate of 3 to 4.75 millimeters and yet has a

---

[17] Commerce's decision to prefer GTA import data over domestic prices based on thickness is
significant given the typical preference for domestic data.  See Hebei Metals & Minerals Imp. &
Exp. Corp. v. United States, 29 CIT 288, 299–300, 366 F. Supp. 2d 1264, 1273–74 (2005) ("A
domestic price is preferred for the calculation of surrogate values by prior practice, policy, and
logic.").

[18] Other record evidence for steel plate of unknown thickness, i.e., Europe MEPS, World HR
Steel Plate, and India MEPS, all also fall within the same range as the JPC and Steelworld data.
See Itochu Second Pre-Prelim SV Submission at Exs. 2I, 2K, 2M.

substantially higher price.  Id. at Ex. 2C.  Thus, contrary to Commerce's belief that thickness

inversely affects price, record evidence shows that relative thickness has little effect on prices of

steel plate and, at most, that thicker plate is slightly more expensive.  Accordingly, substantial

evidence on the record calls into question the reliability of Commerce's selected surrogate value.

The court, therefore, remands for Commerce to consider whether the other data sources render

the GTA India import data unreliable and to explain what record evidence supports its decision

to disregard surrogate data for varying thicknesses of steel plate.

B.     Financial Ratios

Stanley and Itochu challenge Commerce's reliance on Sundram's financial statements

when calculating surrogate financial ratios.  Stanley Br. at 26–40; Itochu Br. at 27–39.  First,

they argue that pursuant to Commerce's policy to exclude surrogate financial ratios from

countries that receive countervailable subsidies, Commerce should have rejected Sundram's

financial statement both because Sundram operates in an Special Economic Zone ("SEZ") and

because Sundram's financial statement indicated that it received special tax incentives under

Section 35(2AB) of India's Income Tax Act to support its research and development program.

Stanley Br. at 27–34; Itochu Br. at 27–32.  Regarding this second alleged subsidy, Stanley argues

that Commerce failed to consider a European Union ("EU") decision finding the aforementioned

section of India's Income Tax Act countervailable.  Stanley Br. at 30–34.  Second, Stanley and

Itochu contend that Sundram is not appropriate as a financial surrogate because it is not a

producer of merchandise comparable to subject nails but instead produces costlier goods, such as

specialized high tensile fasteners and auto equipment.  Stanley Br. at 34–40; Itochu Br. at 32–39.

The government and Mid Continent counter that Commerce acted reasonably because

Sundram produces comparable merchandise such as fasteners and draws steel wire rod in its

production of those fasteners.  Gov't Br. at 32–34; Mid Continent Resp. at 19–26.  The

government and Mid Continent also argue that Sundram's financial statement does not contain

evidence that it received countervailable subsidies from its placement in an SEZ nor does the

record contain evidence that Commerce had reason to believe or suspect that the Section

35(2AB) subsidies are countervailable.  Gov't Br. at 35–36; Mid Continent Resp. at 14–19.

After briefing and oral argument were complete, the government moved for a partial remand

because "Commerce incorrectly concluded that the EU never reviewed the specific section

[Section 35(2AB)] of the Income Tax Act."  See Gov't Mot. for Partial Remand at 4.

     Commerce "may request a remand . . . in order to reconsider its previous position."  SKF

USA Inc. v. United States, 254 F.3d 1022, 1029 (Fed. Cir. 2001).  Although the court may refuse

a remand if Commerce's "request is frivolous or in bad faith," the court will typically grant a

remand if Commerce's "concern is substantial and legitimate."  Id.  A concern is "substantial and

legitimate" when (1) Commerce has a compelling justification for its remand request, (2) the

particular justification for remand is not outweighed by the need for finality, and (3) the scope of

the remand is appropriate.  Ad Hoc Shrimp Trade Action Comm. v. United States, 882 F. Supp.

2d 1377, 1381 (CIT 2013).

     The court grants Commerce's request for a remand as Commerce has identified a

substantial and legitimate concern.  Commerce's justification is compelling because its

determination in the Final Results is based on an error that directly bears on the appropriateness

of using Sundram's financial statement.  See Gov't Mot. for Partial Remand at 4; see also I&D

Memo at 11 ("Congress instructed [Commerce] to 'avoid using any prices which it has reason to

believe or suspect may be dumped or subsidized prices.'").  Commerce appropriately requests a

limited scope for remand:  "to consider whether the EU's determination should cause Commerce

to reconsider using Sundram's financial statement." Id.  Nor do finality concerns outweigh the

need for a remand here where the court is remanding other issues for reconsideration.  Moreover,

there is no allegation or evidence that Commerce's request is frivolous or made in bad faith.

Accordingly, the court remands this matter for Commerce to reconsider whether it has reason to

suspect or believe that Sundram received countervailable subsidies in the light of the EU's

decision finding Section 35(2AB) of India's Income Tax Act countervailable.[19]

### III.    19 U.S.C. § 1677e

#### A.    Specific Facts

Stanley and Jinchi both used "unaffiliated tollers for production of tolled intermediate

inputs."  Preliminary Results, 76 Fed. Reg. at 56,148.  As of the Preliminary Results, Stanley

was unable to obtain FOPs from "a number of its galvanizing tollers" and Jinchi was unable to

obtain FOPs from any of its tollers.  Id.  Commerce determined that neither respondent failed to

cooperate as "[b]oth respondents attempted to obtain the FOPs from their unaffiliated tollers and

documented these attempts."  Id.  Commerce applied neutral facts available to both, using, for

Stanley, "the reported FOPs from Stanley's galvanizers because Stanley did not perform

galvanizing itself" and using, for Jinchi, "Jinchi's own production experience because Jinchi also

performs the same production steps in-house as the tollers."  Id. at 56,149.

---

[19] The court will not address the remaining challenges to the use of Sundram's financial
statements because remand may moot the remaining challenges.  If Commerce, however,
continues to rely on Sundram's financial statements after conducting its redetermination,
Commerce shall address with some detail Itochu's and Stanley's other concerns, particularly
those related to the comparable producer inquiry.  See Stanley Br. at 26–40; Itochu Br. at 27–39;
see also Pls.' Resp. to the Ct.'s Req. for Suppl. Briefing on Recently Issued New & Significant
Auth. 15–17, ECF No. 147 (listing other, subsequent investigations of steel nails in which
Commerce addressed whether Sundaram is a producer of comparable merchandise).

Also, before the Preliminary Results, all three mandatory respondents could not obtain

FOPs from unaffiliated suppliers from which they purchased subject merchandise nails.  Id.

Commerce did note that, although Hongli eventually provided the missing FOP data, Commerce

rejected it as unsolicited and untimely.  Id.  Commerce, however, did not find that the mandatory

respondents failed to cooperate "[b]ecause the respondents attempted to obtain the FOPs from

the unaffiliated producers and documented these attempts."  Id.  Accordingly, the agency applied

neutral facts available, but it explained that it would "issue questionnaires directly to the

unaffiliated producers requesting the FOP data."  Id.

Commerce issued such questionnaires to Hongli's and Jinchi's unaffiliated suppliers on

September 14, 2011.  See Itochu Br. Attach. 1 at 1.  Commerce did not send a questionnaire to

Stanley's supposedly-unaffiliated supplier because "in a post-preliminary supplemental, Stanley

demonstrated that it maintained ownership of the wire rod and paid for the processing services

rather than purchasing subject merchandise from an unaffiliated supplier" and, therefore,

Commerce considered that company to be an unaffiliated semi-finished nail toller for Stanley.

I&D Memo at 19.  Commerce did not issue these supplemental questionnaires to any of the

unaffiliated tollers.  See id. at 19, 27.  Hongli's supplier[20] responded to Commerce's request,

providing complete FOP data for the purchased masonry nails.  Id. at 23.  Jinchi's supplier of

masonry nails[21] advised that it could not provide the requested FOP data because it is a "small

company" that "does not have the capability to respond to [Commerce's] detailed

questionnaires" and "has no need to maintain, in the ordinary course of business, the product

---

[20] The supplier at issue is [[          ]].  See Commerce Req. for FOP Data from Hongli's Supplier
at 1, CD 11 pt. 2 (Sept. 14, 2011).

[21] The supplier at issue is [[                                                          ]].  See Itochu
Br. Attach. 1 at 5.

*Confidential Information Omitted*

specific production records required to answer [Commerce's] questions."   FOPs for Certain

Nails Exported by Jinchi and Produced by Unaffiliated Supplier at 2, PD 20 pt. 2 (Sept. 28,

2011) ("Jinchi Supplier's FOPs").

In the <u>Final Results</u>, Commerce continued to select partial neutral facts available to the

missing FOP information from Stanley's and Jinchi's unaffiliated tollers.  Regarding Stanley,[22]

Commerce selected "for the semi-finished nail toller, . . . Stanley's own production data as

Stanley produces the same nails" and "[f]or the galvanizing FOPs, . . . the reported FOPs from

Stanley's reported galvanizers because Stanley did not perform any galvanizing itself."  <u>I&D</u>

<u>Memo</u> at 19.  Regarding Jinchi,[23] Commerce did not change its facts available determination

and, accordingly, continued to use Jinchi's own production data to fill the gaps created by the

unreported FOPs of its tollers.  <u>See</u> <u>id.</u> at 26–27.

Commerce altered its preliminary determination in certain respects.  For instance,

Commerce determined that Hongli's unaffiliated supplier cooperated by "submit[ing] timely and

complete FOP data" and, consequently, that the use of facts available was no longer appropriate.

<u>Id.</u> at 23.  Also, Commerce applied AFA to Jinchi for the unreported FOPs of its unaffiliated

supplier, determining that the supplier is an "interested party" that failed to cooperate.  <u>Id.</u> at 27.

Commerce explained its reasoning for treating unaffiliated tollers and unaffiliated suppliers

differently, stating "tollers simply perform a function at one stage in the production process,

whereas unaffiliated suppliers provide finished merchandise that is independently subject to the

---

[22] Stanley could not obtain FOPs from one semi-finished nails processor, [[                    ]],
and from a few galvanizers, [[                                                                    ]].
Mem. of Stanley's Percentage of Missing Toller Factors at 1, CD 80 pt. 2 (Feb. 23, 2012).

[23] Jinchi could not obtain FOPs from [[        ]] of its tollers.  <u>Compare</u> Jinchi Sections C & D
Suppl. Questionnaire Resp. at Ex. 19, CD 113 pt. 1 (May 16, 2011), <u>with</u> Jinchi Suppl. Sec. A
Questionnaire Resp. at Ex. 13, CD 105 pt. 1 (Apr. 7, 2011).

*Confidential Information Omitted*

order." Id. at 19, 27.  Thus, Commerce applied adverse inferences to Jinchi for the masonry nails

purchased from its unaffiliated supplier, "using as the AFA rate the highest calculated [normal

value] for subject nails."  Id. at 27–28.  The AFA margin selected of 471.28% was much higher

than any rate derived from actual production data, and, in fact, was nearly four times higher than

the PRC-wide AFA margin of 118.04%.[24]  See Itochu Br. at 3, 8, 15, 18–19; Tr. of Oral Arg. at

121; see also Certain Steel Nails from the People's Republic of China:  Issues and Decision

Memorandum for the Final Results of the First Antidumping Duty Administrative Review at 29,

A-570-909 (Mar. 14, 2011), available at http://enforcement.trade.gov/frn/summary/prc/2011-

6728-1.pdf ("[Commerce] . . . assigned the PRC-wide entity an AFA margin of 118.04

percent.").

    B.      Application of Facts Available and Adverse Inferences

    The Federal Circuit has described the application of AFA as a two-part inquiry.  See

Mueller Comercial de Mex., S. de R.L. de C.V. v. United States, 753 F.3d 1227, 1231–32 (Fed.

Cir. 2014); Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003).  First,

Commerce shall use "facts otherwise available" if "necessary information is not available on the

record" or "an interested party or any other person":

> (A) withholds information that has been requested by [Commerce] . . . ,
> (B) fails to provide such information by the deadlines for submission of the
> information or in the form and manner requested . . . ,
> (C) significantly impedes a proceeding . . . , or
> (D) provides such information but the information cannot be verified . . . .

19 U.S.C. § 1677e(a).  In using facts otherwise available, Commerce must fill gaps in the record

if it has received less than the full and complete facts needed to make a determination because a

---

[24] Throughout its brief and in a public oral argument, Itochu repeatedly states that the AFA rate
selected by Commerce translated to a margin of 471.28%.  Itochu Br. at 3, 8, 15, 18–19; Tr. of
Oral Arg. at 121.  No party contests the accuracy of the stated percentage.

party has failed to provide requested information within the deadline for submission.  <u>Nippon Steel</u>, 337 F.3d at 1381 ("The reason for the failure is of no moment.").

Second, Commerce may apply an adverse inference in selecting from the facts otherwise available, or AFA, if "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information."  19 U.S.C. § 1677e(b).  A party fails to cooperate to the best of its ability when it fails "to do the maximum it is able to do."  <u>Nippon Steel</u>, 337 F.3d at 1382.  In determining whether a party has failed to do the maximum it is able to do, Commerce first "make[s] an objective showing that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations."  <u>Id.</u>  Commerce also then

> make[s] a subjective showing that the respondent under investigation not only has failed to promptly produce the requested information, but further that the failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records.

<u>Id.</u> at 1382–83.

Commerce acted within its discretion both by refusing to apply facts available to Hongli because Honlgi and its supplier provided all relevant FOP data and also by applying neutral facts available to Stanley for the unreported FOPs of its unaffiliated tollers.  Furthermore, although Commerce properly decided to apply neutral facts available to Jinchi for the unreported FOPs of its unaffiliated toller, Commerce erred when it applied an adverse inference to Jinchi for the missing data from its unaffiliated supplier.  Commerce's <u>Final Results</u> are remanded to reconsider whether application of AFA to Jinchi is appropriate and, if not, to apply a neutral facts available rate to Jinchi for the unreported FOPs of its masonry nail supplier.

    *1.   Hongli*

Mid Continent argues that Commerce erred in not applying partial AFA to Hongli for

Hongli's failure to act to the best of its ability by belatedly providing FOP data for its

unaffiliated supplier of cut plate masonry nails.  Mid Continent Br. at 28–31.  Mid Continent

recognizes that Hongli eventually did provide this FOP data but claims that Hongli only did so

after it became aware of its "true margin risk."  Id. at 28–30.  The government and Itochu reply

that Commerce reasonably did not apply AFA because Hongli did not fail to provide any

information to Commerce, regardless of Hongli's intent.  Gov't Br. at 18; Itochu Resp. at 30–39.

Commerce did not err in deciding not to select from the facts otherwise available to value

Hongli's FOPs because there was no missing record information and Hongli fully cooperated

with the administrative review.  After the Preliminary Results, Commerce requested the missing

FOP data from Hongli's supplier.[25]  See Itochu Br. Attach. 1 at 1; I&D Memo at 23.  Mid

Continent does not challenge Commerce's decision to request this information from Hongli's

supplier.  Thereafter, Hongli's supplier responded and "submitted timely and complete FOP data

for the[] purchased nails," thereby providing Commerce enough time to consider the data and

calculate an AD margin.  I&D Memo at 23.  Whatever the reason for the initial failure of Hongli

to provide the unreported FOP data, Commerce had usable data on the record that the agency

itself had accepted, meaning Commerce had all necessary information available to it.  See 19

U.S.C. § 1677e(a)(1).  Mid Continent speculates as to Hongli's motive for not providing this data

earlier, Mid Continent Br. at 28–30, but this argument does not speak to the statutory

requirements.  See AK Steel Corp. v. United States, 28 CIT 1408, 1355 (2004) ("[S]ection

---

[25] [[          ]] production accounted for a small portion of Hongli's reported U.S. sales, only
[[  ]] percent.  Hongli Sections C & D Questionnaire Resp. at 3, CD 79 pt. 1 (Feb. 25, 2011)
("Hongli Secs. C & D").

*Confidential Information Omitted*

1677e(b) does not inject a <u>mens rea</u> consideration into Commerce's discretion on whether to

apply an adverse or neutral inference."). Commerce acted reasonably in relying on the certified

submissions on the record, in which Hongli and its supplier explained why they could not

provide the requested information.[26] And, Mid Continent asserts, without providing citation to

the record, that Hongli only submitted this information after Commerce made clear that it would

not verify the respondent's requests. <u>See</u> Mid Continent Br. at 23, 29. In reality, Mid Continent

twice requested verification, once on January 10, 2010, and again on June 9, 2011, and this latter

request was made a mere five days before Hongli first submitted the FOP data of its unaffiliated

supplier. <u>See</u> Pet'rs First Req. for Verification at 1, PD 139 pt. 1 (Jan. 10, 2010); Pet'rs Second

Req. for Verification at 1, PD 266 pt. 1 (June 9, 2011); <u>see also</u> Hongli Revised Section C & D

Questionnaire Resp. for Supplier at 1, CD 120 pt. 1 (June 14, 2011). There is no record evidence

to suggest that Commerce notified the parties that it would not conduct verification before

Hongli submitted the FOP data on June 14, 2011. Furthermore, Stanley did not submit its

opposition to Mid Continent's latter request for verification until June 16, 2011, two days after

Hongli provided the FOP data, indicating a belief by one respondent that verification might still

occur. <u>See</u> Stanley's Resp. to Pet'rs Req. for Verification at 1, PD 272 pt. 1 (June 16, 2011).

---

[26] Prior to the <u>Preliminary Results,</u> Hongli stated in its Section D Questionnaire Response that it
was unable to provide this data to Commerce because, although it made "repeated attempts" to
obtain the data from its supplier "through meetings, telephone calls and correspondence," the
supplier "has so far refused to permit Hongli access to its accounting and production records
necessary to derive factors of production data." Hongli Secs. C & D at 2. Hongli also stated that
it would continue to seek its supplier's cooperation and report FOP data if it becomes available.
<u>Id.</u> at 2–3. Almost three months prior to the <u>Preliminary Results,</u> Hongli eventually did submit
the requested FOP data, but it was rejected as unsolicited and untimely information. <u>Preliminary
Results,</u> 76 Fed. Reg. at 56,149; <u>see</u> Hongli Revised Section C & D Questionnaire Resp. for
Supplier at 4, CD 120 pt. 1 (June 14, 2011) (explaining that the supplier "recently agreed to
Hongli's request [for the FOP data], based on the understanding that its data would be submitted
through counsel and would not be shared with Hongli").

Instead, Commerce found that the reported data were unchallenged as being either incomplete or inaccurate and, therefore, Commerce relied on them.  I&D Memo at 23. Commerce also did not make a finding, nor is there record evidence to support a finding, that Hongli or its supplier withheld information, failed to provide the information, significantly impeded the proceeding, or provided unverifiable data.  See 19 U.S.C. § 1677e(a)(2). Accordingly, Commerce's decision to not apply facts available or an adverse inference to Hongli is supported by substantial evidence.  See Zhejiang DunAn, 652 F.3d at 1346 ("Commerce first must determine that it is proper to use facts otherwise available before it may apply an adverse inference." (emphasis added)).

2.    Stanley

Mid Continent challenges Commerce's decision not to apply partial AFA to Stanley for failure to report certain FOP data from Stanley's semi-finished nail toller and certain of its galvanizing tollers.  Mid Continent Br. at 19–28.  And, in the alternative, Mid Continent disputes Commerce's selected neutral facts available as improperly assuming that the unreported tollers were as efficient Stanley and its other tollers.  Id. at 25–28.

The government and Stanley argue that Commerce properly did not apply an adverse inference to Stanley because not only did the missing data represent a "small portion of transactions from the subcontractors" but also Stanley cooperated to the best of its ability.  Gov't Br. at 13–15; Mem. of Pls. the Stanley Works (Langfang) Fastening Sys. Co., Ltd. & Stanley Black & Decker, Inc. in Opp'n to Mid Continent Nail Corp.'s Rule 56.2 Mot. for J. upon the Admin. R. 15–26, ECF No. 64 ("Stanley Resp.").  They also defend Commerce's selection of neutral facts available as reasonable.  Gov't Br. at 17; Stanley Resp. at 26–28.

Commerce's decision to apply neutral facts available to Stanley is supported by

substantial evidence.  First, Commerce properly decided to select from the facts otherwise

available because there were gaps in the record pertaining to the FOPs of Stanley's semi-finished

nail toller and certain galvanizing tollers.  Mem. of Stanley's Percentage of Missing Toller

Factors at 1, CD 80 pt. 2 (Feb. 23, 2012) ("Stanley's Missing Toller Factors").[27]  Therefore,

Commerce reasonably determined that there were "missing FOPs from [Stanley's] tollers" and,

therefore, applied "partial [facts available], . . . for the tolling FOPs Stanley was unable to

obtain."  I&D Memo at 18–19; see 19 U.S.C. § 1677e(a)(1), (a)(2)(B).

Second, substantial evidence supports Commerce's conclusion that the application of an

adverse inference is not appropriate as Stanley acted to the best of its ability by cooperating with

Commerce's efforts to obtain the requested FOP data.  See Ta Chen Stainless Steel Pipe Co. v.

United States, 31 CIT 794, 812 (2007) (explaining that application of an adverse inference is

discretionary).  Early in the proceedings, Stanley was forthcoming and identified its tollers in its

initial Section A questionnaire response.  Stanley Section A Questionnaire Resp. at Ex. A-26,

CD 62 pt. 1 (Jan. 21, 2011).  Regarding its galvanizers, Stanley did obtain the FOPs from the

majority of its galvanizers by percentage and submitted the FOPs to Commerce in a timely

fashion.  See id.; Stanley Section D Questionnaire Resp. at 28–29 & Ex. D-10, CD 69 pt. 1 (Feb.

11, 2011); see also Preliminary Results, 76 Fed. Reg. at 56,148.  On May 6, 2011, Stanley

responded to Commerce's questionnaire requesting the remaining galvanizing toller FOPs,

explaining that Stanley contacted each of the galvanizers, requested that they provide the

---

[27] Specifically, Commerce determined that the semi-finished nail toller at issue, which
"processed Stanley's wire rod into nails," accounted for only "[[     ]] percent of Stanley
Langfang's total output of subject merchandise," and the unreported galvanizing tollers
"performed galvanizing for Stanley representing [[     ]] percent of all galvanizing services."
Stanley's Missing Toller Factors at 1.

*Confidential Information Omitted*

necessary FOP data, and that each galvanizer responded that they no longer had the requested

documents.  Stanley Suppl. Section D Questionnaire Resp. at 7–8, CD 109 pt. 1 (May 6, 2011)

("Stanley Suppl. Sec. D") (stating that its galvanizers' reasons included going out of business,

losing documents in a fire, or losing records in the moving process); see also Stanley Resp. at 7–

8.  Stanley documented these efforts and provided proof of its communications to Commerce.

Stanley Suppl. Sec. D at Exs. SD-4(a)–SD-4(b).  Similarly, for the missing FOP data from the

semi-finished nail toller, Stanley twice responded to Commerce and explained that the requested

data would have no material effect on Stanley's reported FOPs because the toller accounted for a

de minimis percentage of nail processing.  Id. at 5; Stanley Suppl. Sections C & D Questionnaire

Resp. at 16–18, CD 127 pt. 1 (July 1, 2011) (explaining also that there are "methodological

difficult[ies] of merging the semi-finished [nail toller's] FOPs into Stanley Langfang's FOPs").

    Although Commerce indicated an intent to again ask Stanley and its semi-finished nail

toller for FOP data after the Preliminary Results, Commerce changed course and did not request

additional information after it determined that semi-finished nail toller was, in fact, a toller rather

than a supplier.[28]  See I&D Memo at 19.  Commerce agreed with Stanley that "the portion of

FOPs Stanley was unable to obtain represented only a small quantity."  Id.  Commerce,

therefore, accepted Stanley's reasonable explanations, did not make an additional documentation

request of Stanley for the missing FOP data from its tollers, and concluded that Stanley did not

fail to cooperate.  See id. at 18–19; see also Maverick Tube Corp. v. United States, Consol. No.

2016-1649, 2017 WL 2324225, at *3, *8 (Fed. Cir. May 30, 2017) (sustaining, in a

countervailing duty investigation, Commerce's decision not to apply AFA to the Government of

---

[28] Mid Continent does not argue Commerce erred in determining that the semi-finished nail toller
is actually a toller, rather than a supplier, nor does it argue that Commerce abused its discretion
by not soliciting FOP information from the semi-finished nail toller.

Turkey, where "there was no evidence that [the Government of Turkey] had access to or maintained the . . . data that it claimed that it was unable to provide").  Absent any additional requests for data, the court cannot say that Stanley failed to cooperate with such requests.

Third, Commerce's selection of neutral facts available is supported by substantial evidence.  As neutral facts available, Commerce used Stanley's actual production data to fill the gaps created by the unreported FOPs of the semi-finished nail toller, and Commerce used the galvanizing FOPs of Stanley's reported galvanizers to fill the gaps for the unreported galvanizers as Stanley did not perform galvanizing itself.  I&D Memo at 19.  Mid Continent contends that Commerce unreasonably assumed that the unreported tollers operated as efficiently as Stanley and the other tollers for which there was actual production data on the record.  Mid Continent Br. at 26–27.  But, Mid Continent fails to cite to record evidence to support its own assumption that these companies did not operate at reasonably comparable efficiencies.  It appears that Commerce sought to calculate as accurate a rate as possible by using actual production data, which is reasonable here especially because the missing data accounts for only a small percentage of overall production.  See Stanley's Missing Toller Factors at 1.  It is telling that Mid Continent does not propose any alternative neutral facts available on the record that Commerce could have selected.[29]  Commerce was charged with filing gaps in the record and the decision it made is reasonable.

---

[29] Mid Continent notes that "Commerce has sought out surrogate value for a missing step or input, rather than accept respondents' data . . . in previous cases."  Mid Continent Br. at 28 n.11.  Even if this tool is available to Commerce, Mid Continent does not argue that Commerce is required to do so or that it abuses its discretion by not requesting such data.  Commerce was not required to delay the proceedings further by seeking out new data from the parties, when it had actual production data on the record and chose to rely on it.

     3.    *Jinchi*

Mid Continent and Itochu challenge Commerce's facts available determinations relating to Jinchi.  Similar to the issues it raises relating to Stanley, Mid Continent argues that Commerce erred by not applying partial AFA to Jinchi for the failure to report FOP data from various tollers that drew nail wire, produced nails, and galvanized nails.  Mid Continent Br. at 19–28.  Mid Continent also challenges Commerce's selection of neutral facts available.  Id. at 25–28.  Itochu, on the other hand, disputes Commerce's application of a partial AFA margin to Jinchi's finished nails produced by its unaffiliated supplier of masonry nails.  Itochu Br. at 8–19.  First, Itochu argues that both Jinchi and its unaffiliated supplier acted to the best of their abilities.  Id. at 8–12.  Second, Itochu argues that Commerce cannot apply an AFA rate to Jinchi for the failure of its unaffiliated supplier to cooperate.  Id. at 12–14.  Third, Itochu argues that the partial AFA margin of 471.28% selected by Commerce was unlawful.  Id. at 15–19.

Regarding Mid Continent's challenges, the government responds that Commerce properly did not apply an adverse inference to Jinchi because Jinchi cooperated by attempting to obtain the FOPs from its unaffiliated tollers.  Gov't Br. at 13–15; see Itochu Resp. at 15–23.  The government contends that Commerce acted within its discretion in not applying an adverse inference and that its rationale to treat tollers and suppliers differently is reasonable.  Gov't Br. at 15–17.  The government and Itochu also argue that Commerce reasonably relied on Jinchi's own production data as neutral facts available.  Id. at 17; Itochu Resp. at 24–30.

Regarding Itochu's challenges, the government and Mid Continent respond that Commerce's decision to apply partial AFA is supported by substantial evidence because Jinchi's unaffiliated supplier is an interested party to the proceeding and both Jinchi and its supplier failed to cooperate by providing crucial FOP information.  Gov't Br. at 19–24; Mid Continent

Resp. at 4–10.  The government and Mid Continent also argue that Commerce lawfully selected

as partial AFA the highest calculated normal value for subject nails based on primary data

submitted by respondents.  Id. at 21, 22–23; Mid Continent Resp. at 10–13.

First, Commerce's decision to select from the facts otherwise available regarding the

missing information of Jinchi's supplier and tollers is supported by substantial evidence.  Despite

Commerce's requests for Jinchi to provide missing FOP data from one supplier and certain

tollers, Commerce never received the necessary data it required to calculate normal value.  See

See Final Analysis Mem. for Jinchi at 2 n.3, CD 78 pt. 2 (Feb. 23, 2012) ("Jinchi Final Analysis

Mem.").  Commerce, therefore, correctly concluded that necessary information was missing

from the record and that application of facts available was warranted.  I&D Memo at 27; see 19

U.S.C. § 1677e(a)(1), (a)(2)(B).

Second, although Commerce properly determined that adverse inferences were not

warranted for the unreported FOPs of Jinchi's tollers, Commerce improperly applied an adverse

inference to Jinchi for the failure to cooperate of a separate, unaffiliated supplier.  Since the

initiation of the present suit, the Federal Circuit has held that 19 U.S.C. § 1667e(b) does not bar

Commerce from "drawing adverse inferences against a non-cooperating party that have collateral

consequences for a cooperating party."  Mueller, 753 F.3d at 1236; see also 19 U.S.C.

§ 1677e(b)(1) ("[Commerce] may use an inference that is adverse to the interests of that party in

selecting from among the facts otherwise available." (emphasis added)).  In Mueller, a fully-

cooperating mandatory respondent exported goods that it purchased from two suppliers, but it

was unable to provide cost of production data for one of its suppliers, which had also been

selected as a mandatory respondent in the review.  753 F.3d at 1229–30.  Not only did

Commerce apply an adverse inference to the non-cooperating supplier in calculating that

company's own dumping margin, but Commerce also applied an adverse inference to the fully-

cooperating mandatory respondent for the goods purchased from the non-cooperating supplier.

Id.  The Federal Circuit recognized that Commerce may "use[] an evasion or inducement

rationale" in applying AFA to a fully-cooperating respondent, such as considering whether the

fully cooperating party is in a position to induce the non-cooperating party into providing the

missing information or whether the non-cooperating party could simply evade a high AFA

margin by exporting through a different, unrelated company.  Id. at 1234–35.  But, "if the

cooperating entity has no control over the non-cooperating suppliers, a resulting adverse

inference is potentially unfair to the cooperating party."  Mueller, 753 F.3d at 1235 (citing SKF

USA Inc. v. United States, 630 F.3d 1365, 1375 (Fed. Cir. 2011)).  The Federal Circuit,

therefore, cautioned that, in using AFA to compute the margin of a cooperating party,

"Commerce cannot confine itself to a deterrence rationale and also must carry out a case-specific

analysis of the applicability of deterrence and similar policies," and also should evaluate if there

is a "direct adverse effect" on the non-cooperating party.  Mueller, 753 F.3d at 1234, 1236.

Commerce failed to conduct the necessary case-specific analysis to determine whether it

was appropriate to apply an adverse inference to Jinchi for its supplier's failure to cooperate.[30]

---

[30] To the extent that Itochu argues that Commerce erred because Jinchi's supplier acted to the best of its ability, Itochu Br. at 10–11, Commerce's determination is supported by substantial evidence.  Although Jinchi attached a letter from its supplier explaining that [[     ]] is a small company that does not export to the United States and is without the capacity to respond to Commerce's questionnaires because it [[

                        ]], Jinchi Supplier's FOPs at Attach. 1; see Itochu Br. at 11, these reasons are not enough under the best of its ability standard.  See Nippon Steel, 337 F.3d at 1382 ("While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping.").  The supplier did not provide any cost-related data to assist Commerce's review, nor did it seek an extension to try to collect at least some relevant documents.  It appears reasonable for Commerce to assume that a reasonable Chinese producer would maintain at least some basic accounting

(continued . . .)

Importantly, Commerce never made a finding that <u>Jinchi</u> failed to cooperate, and the court will

not sustain Commerce's decision on such a basis.  <u>See</u> <u>SEC v. Chenery Corp.</u>, 318 U.S. 80, 88

(1943) ("The grounds upon which an administrative order must be judged are those upon which

the record discloses that its action was based.").  Instead, the record shows that Jinchi continued

to work with Commerce to provide the requested data.  Jinchi provided a complete list of its

suppliers and tollers to Commerce more than five months before the <u>Preliminary Results</u>.  <u>See</u>

Jinchi Sec. A Questionnaire Resp. at Ex. A-11, CD 81 pt. 1 (Feb. 28, 2011) (complete suppliers);

Jinchi Suppl. Sec. A Questionnaire Resp. at Ex. 13, CD 105 pt. 1 (Apr. 7, 2011) (complete

tollers); <u>I&D Memo</u> at 27.  In response to Commerce's request for FOPs of its suppliers and

tollers, Jinchi explained to Commerce that it requested the FOP data from all suppliers and

tollers "[f]irst by telephone call and then by a more formal letter, sent via email" and that Jinchi

"followed up with these companies by phone and, based on its conversations, Jinchi sent a

second letter . . . specifying exactly what information/documentation is needed to respond."

Jinchi Sections C & D Suppl. Questionnaire Resp. at 27, CD 113 pt. 1 (May 16, 2011) ("Jinchi

Suppl. Secs. C & D").  Despite its efforts, Jinchi was not able to obtain the requested

information.[31]  <u>Id.</u>  Jinchi provided Commerce with documentation of each of the letters it sent to

the companies and the letters Jinchi received in response.  <u>Id.</u> at Exs. 17–19.  Jinchi explained

that its suppliers and tollers are "small Chinese companies."  <u>Id.</u> at 27.  Of the companies that did

respond to Jinchi, the reasons for being unable to provide the requested FOPs ranged from

---

documentation regarding costs.  This complete lack of cooperation and failure to make any real
attempt to provide information is the type of behavior for which AFA is typically warranted.

[31] As Commerce explained, Jinchi could not obtain FOPs from its tollers, which represented
"[[      ]]% of wire drawing, [[      ]]% of semi-finished nail making, and [[      ]]% of
galvanizing."  Jinchi Final Analysis Mem. at 2 n.3.  And, Jinchi's unaffiliated supplier of
masonry nails accounted for [[      ]]% of Jinchi's sales.  <u>Id.</u>

*Confidential Information Omitted*

confidentiality concerns to inability to produce the requested records due to lack of institutional

accounting and financial capacity.  See id. at Ex. 19.  Commerce did not make an additional

request for the FOPs of Jinchi's tollers, determining instead that "because Jinchi documented that

it attempted to obtain this information, [Commerce does] not find that Jinchi failed to cooperate."

I&D Memo at 27.

   But, as discussed, Commerce did make an additional request for the missing FOPs from

Jinchi's masonry nails supplier after the Preliminary Results.  Commerce sought that information

directly from Jinchi's supplier, rather than Jinchi, seemingly recognizing that Jinchi did not have

access to the necessary information.  See Itochu Br. Attach. 1 at 1.  Jinchi sent a letter to its

supplier explaining the importance of providing the requested information to Commerce, but

Jinchi's supplier again responded that it was unable to provide the requested data.  See Jinchi

Supplier's FOPs at 2 & Attach. 1.  Commerce did not make a finding that Jinchi had sufficient

control over its supplier such that it could induce cooperation, that Jinchi's supplier attempted to

evade a higher AD rate by using Jinchi as an exporter, or that application of an AFA margin to

Jinchi would directly and adversely affect Jinchi's supplier's interests.[32]  Nor does Commerce's

---

[32] Commerce stated, in general, that it treats unaffiliated suppliers differently because their products are independently subject to an AD order.  I&D Memo at 27.  Commerce did not link its rationale to a potential evasion concern nor did it identify case-specific facts to lead the agency to believe that such evasion would occur.  It is not clear from the record that an evasion scheme is occurring, where [[          ]] is not included on the list of companies for which Commerce initiated the present or immediately preceding administrative reviews, meaning it has not been assigned a margin in an AD review.  See Initiation Notice, 75 Fed. Reg. at 60,081; Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 74 Fed. Reg. 48,224, 48,227–28 (Dep't Commerce Sept. 22, 2009).  In fact, [[          ]] stated that it does not export to the United States.  Jinchi Supplier's FOPs at Attach. 1.  Thus, unlike in Mueller, where the non-cooperating supplier might benefit if Commerce did not apply an adverse inference to the fully-cooperating respondent that purchased nails from it because the non-cooperating supplier was also a mandatory respondent with an AFA margin, the same concern does not appear present here.  See 753 F.3d at 1229–30, 1234–35.

*Confidential Information Omitted*

stated rationale explain how Jinchi's actions with respect to its supplier differed in any material way from its actions with respect to its tollers, such that Jinchi failed to act to the best of its ability in supplying the FOPs of its supplier but not its tollers.   Commerce's rationale rests, instead, on the role that an unaffiliated party has, rather than the relationship between the respondent and the unaffiliated party, and thereby punishes a company like Jinchi without justifying how applying an AFA margin for the limited missing data of 471.28%, a rate nearly four times higher than the PRC-wide rate, to Jinchi furthers the statute's goal of cooperation. See Changzhou Wujin Fine Chem. Factory Co. v. United States, 701 F.3d 1367, 1378 (Fed Cir. 2012) ("[A]pplying an adverse rate to cooperating respondents undercuts the cooperation-promoting goal of the AFA statute.").   The court cannot conclude that Commerce's stated rationale is a reasonable application of its policy goals of inducing cooperation or preventing evasion given "the particular facts," nor that Commerce properly accounted for "the predominant interest in accuracy," as required by the Federal Circuit.   See Mueller, 753 F.3d at 1233; see also Tianjin Magnesium Int'l Co. v. United States, Slip Op. 11-17, 2011 WL 637623, *2 (CIT Feb. 11, 2011) ("If [a cooperating respondent] is to receive an AFA rate, Commerce must link [the respondent] to its supplier's failures, as a matter of fact.").   Accordingly, the court remands Commerce's decision to apply an adverse inference to the unreported FOPs of Jinchi's supplier. On remand, Commerce may either make the necessary factual determinations to explain why application of AFA to Jinchi, a fully cooperating party, is appropriate or apply a neutral facts available margin to Jinchi.[33]

---

[33] In conducting its remand, Commerce shall apply the law in effect at the time that Commerce made its facts available and AFA determinations.   See Fresh Garlic Producers Ass'n v. United States, 121 F. Supp. 3d 1313, 1332–33 (CIT 2015).   Because the Trade Preferences Extension Act of 2015 ("TPEA") was signed into law on June 29, 2015, see Pub. L. No. 114-27, 129 Stat.

(continued . . .)

Third, Commerce's selection of a neutral facts available rate for the missing information of Jinchi's tollers is supported by substantial evidence.  Commerce had record evidence for the vast majority of Jinchi's production for each tolled step of the production process.  See Jinchi Final Analysis Mem. at 2 n.3.  Mid Continent claims that Jinchi's statement that it processed nails in "significantly greater quantities" than its tollers indicates that, under economies of scales principles, that Jinchi would have had lower costs than its tollers.  Mid Continent Br. at 26 (quoting Jinchi Suppl. Secs. C & D at 28).  But, in the questionnaire response cited by Mid Continent, Jinchi states that it processed nails "in significantly greater quantities than the quantities outsourced," indicating Jinchi's response does not necessarily mean that it processes more nails in absolute terms than its tollers do such that it operates more efficiently.  Jinchi Suppl. Secs. C & D at 28.  Instead, as with the neutral facts available rate selected for Stanley, Commerce reasonably relied on Jinchi's actual production experience to fill gaps in the record, given that Commerce had complete FOP information for each step of the production process of subject merchandise produced by Jinchi.  Having held that Commerce improperly applied an adverse inference to Jinchi, it is premature for the court to decide whether Commerce's selection of an AFA rate was based on substantial evidence or whether Commerce lawfully incorporated the AFA rate into the rate calculated for the fully-cooperating separate rate respondents.[34]

---

362 (2015), and Commerce published its facts available and AFA determinations prior to that, the TPEA does not apply on remand.

[34] If Commerce continues to rely on an adverse inference for Jinchi and then use the selected AFA rate in the calculation of the separate rate for unexamined companies, it should explain what effect, if any, the Federal Circuit's decision in Changzhou Wujin has on such a decision. See 701 F.3d at 1378–79; see also Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 873, reprinted in 1994 U.S.C.C.A.N. 4040, 4201 (providing that Commerce may use "other reasonable methods" where a resulting weighted-

(continued . . .)

## CONCLUSION

For the foregoing reasons, Commerce's <u>Final Results</u> are remanded for Commerce not only to evaluate Mid Continent's responses to the respondent selection process questions posed by the court, but also to reconsider Commerce's valuation of steel plate, its selection of Sundram's surrogate financial statement, and its application of a partial AFA margin to Jinchi for the missing information pertaining to Jinchi's unaffiliated supplier.  In all other respects, Commerce's <u>Final Results</u> are sustained.  It is hereby

**ORDERED** that Mid Continent provide written responses to Commerce by July 24, 2017, regarding the questions posed by this court, specifically:

    1.    Why was a broad review initially requested?

    2.    How did it come about that Mid Continent withdrew the majority of the requests for review?

    3.    Were payments made in exchange for the withdrawal of the requests? If so, what is the legal basis for the collection of such payments by a party other than the government?

**ORDERED** that Commerce shall have until September 22, 2017, to file its remand results;

**ORDERED** that the parties shall have until October 23, 2017, to file objections; and

**ORDERED** that the government shall have until November 6, 2017, to file its response.


                                      __/s/ Jane A. Restani__

Dated: June 22, 2017                         Jane A. Restani
      New York, New York                      Judge

---

average margin is not "reasonably reflective of potential dumping margins for non-investigated exporters or producers").